USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/8/2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Kathryn Louise Davis,

                    Plaintiff,

           -against-

Commissioner of Social Security,

                  Defendant.

20-cv-05773 (SDA)

**OPINION AND ORDER**

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE:**

Plaintiff Kathryn Louise Davis ("Davis" or "Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security (the "Commissioner") that denied her application for Supplemental Security Income ("SSI"). (Compl., ECF No. 1.) Presently before the Court are the parties' cross-motions, pursuant to Federal Rule of Civil Procedure 12(c), for judgment on the pleadings. (Pl.'s Not. of Mot., ECF No. 20; Comm'r Not. of Mot., ECF No. 22.) For the reasons set forth below, Plaintiff's motion for judgment on the pleadings is DENIED and the Commissioner's cross-motion is GRANTED.

## BACKGROUND

### I.    Procedural Background

On June 21, 2017, Davis filed an application for SSI, with an alleged disability onset date of December 15, 2014. (Administrative R., ECF No. 19 ("R."), 10.) The Social Security Administration ("SSA") denied her application on August 1, 2017 and Davis filed a written request for a hearing before an Administrative Law Judge ("ALJ") on August 17, 2017. (Id.) On January 28, 2019, Davis appeared for a hearing before ALJ Kieran McCormack. (R. 60-71.) Davis was not

represented by an attorney and requested that the hearing be postponed so that she could obtain counsel. (R. 60-71.) The ALJ approved that request and also sought additional information from Davis regarding her treatment since July 2017 so that the ALJ could assist with obtaining additional records. (R. 66-69.) In addition, the ALJ set up a consultative psychiatric evaluation for Davis. (R. 69.)

On June 26, 2019, a follow-up hearing was held before ALJ McCormack. (R. 32-58.) Davis was represented at the hearing by attorney Gabriel Hermann. (R. 34.) In a decision dated July 3, 2019, ALJ McCormack found Davis not disabled. (R. 10-23.) On September 2, 2019, Davis requested review of the ALJ decision from the Appeals Council. (R. 4.) Her request was denied on May 22, 2020, making ALJ McCormack's decision the Commissioner's final decision. (R. 1-3.) This action followed.

## II.   <u>Non-Medical Evidence</u>

Born on December 20, 1989, Davis was 24 years old on the alleged onset date. (*See* R. 72.) Davis completed four or more years of college. (R. 81, 223.) Davis sometimes worked as a bookkeeper in her mother's veterinary clinic. (R. 12, 80, 223, 246.)

Davis completed a Function Report on July 12, 2017. (R. 234-43.) Davis reported that she tried to function, but sometimes would sleep through the day or get overwhelmed and find it difficult to leave her room. (R. 234.) Davis reported that she helped with basic care of animals and was physically able to complete personal care tasks, but anxiety and fear kept her from being able to do them regularly. (R. 235.) Davis further reported that she had trouble taking medications consistently and sometimes prepared meals once per day or did work around the house, but frequently was not able to. (R. 236.) Davis reported that she tried to go outside daily,

but often was unable to and that she spent time watching television, but no longer had interest in other hobbies. (R. 237-38.) In terms of social activities, Davis reported that she would check in with friends and sometimes play games and that she went to friends' homes on a regular basis, up to a couple of times per week. (R. 238.) She reported problems getting along with others, although not with people in authority, and that she limited her exposure to other people due to fear. (R. 239, 241.) Davis also reported problems paying attention, finishing what she started and coping with stress or changes in a schedule. (R. 240-41.) Davis reported that her anxiety became unmanageable in college and that she would experience panic attacks at least weekly. (R. 241-42.)

### III.   Medical Evidence Before the ALJ

#### A.   Psychiatrist Dr. Robert Roy, M.D.

Davis began psychiatric treatment with Dr. Roy in 2011 or 2012.[1] (R. 314, 441.) Dr. Roy's treatment notes indicate that between at least March 2017 and April 2019, he saw Davis approximately once every few months for medication management. (R. 324-26, 426-28; *see also* R. 314.)

On July 19, 2017, Dr. Roy completed a questionnaire as requested by the New York State Office of Temporary and Disability Assistance ("OTDA").[2] (R. 314-16.) Dr. Roy stated Davis's diagnoses as mood disorder and major depression, severe, recurrent and described the following

---

[1] The Court notes that the record only contains treatment notes from March 2017 through April 2019. (R. 324-26, 426-28.) In July 2017, the ALJ requested records going back to June 2015. (R. 314.) On February 2019, the ALJ requested records going back only to July 20, 2017 and on June 19, 2019, Plaintiff's then counsel, Gabriel Hermann, requested records going back only to June 1, 2017. (R. 425.)

[2] OTDA makes medical eligibility determinations for the SSA. *See* OTDA Core Services, https://www.ny.gov/agencies/office-temporary-and-disability-assistance (last visited Nov. 9, 2021).

symptoms: "anxiety, depression, trouble with focus, overall organization, obsessive thoughts, negative/self-defeating thoughts." (R. 314.) Dr. Roy stated that Davis's conditions were chronic and her prognosis was guarded. (*Id*.) Dr. Roy noted that Davis's mood had been "extremely variable over the years, with only brief 'well' periods never long enough to consistently function in school or work settings." (*Id*.) Dr. Roy assessed Davis's mood and affect as "some anxiety and depression present" and found her sensorium and intellectual functions to be good and/or normal. (R. 314-15.) He further assessed that Davis could perform basic activities of daily living, but that she got "overwhelmed when demands increase[d]." (R. 315.)

In terms of her ability to function in a work setting, Dr. Roy opined that Davis had trouble keeping her mood steady, which led to trouble performing tasks consistently. (*Id*.) Dr. Roy opined that Davis's understanding and memory decreased when she was stressed and that her ability to sustain concentration and persistence were "poor to fair when overwhelmed." (*Id*.) Similarly, Dr. Roy opined that Davis's ability to engage in social interactions decreased when she was anxious or depressed. (R. 315-16.) Finally, he found no limitations in Davis's ability to adapt, including to respond to changes in a work setting, set realistic goals or make plans independently. (R. 316.)

On January 9, 2019, Dr. Roy completed a Psychological Mental Impairment Functional Capacity Assessment for Davis. (R. 441-47.) Dr. Roy identified Davis's symptoms as follows: sleep disturbance, mood disturbance, emotional lability, recurrent panic attacks, anhedonia or pervasive loss of interests, feelings of guilt/worthlessness, difficult thinking or concentrating, social withdrawal or isolation, decreased energy, and generalized persistent anxiety. (R. 441.) When asked to describe the clinical findings supporting Davis's symptoms, Dr. Roy wrote "[o]ngoing, chronic depressed mood[;] [g]eneralized anxiety and panic[;] [p]oor focus and

motivation." (R. 442.) Dr. Roy opined that Davis was "unable to work in any capacity." (R. 443; *see also* R. 446.)

In completing the chart regarding mental abilities for unskilled work, Dr. Roy indicated that Davis's ability to maintain attention for a two-hour segment, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being unduly distracted, get along with co-workers and peers and respond to changes in a work setting were "inadequate." (R. 444.) He also opined that Davis did not have the ability to maintain regular attendance and be punctual within customary, usually strict tolerances, complete a normal workday and work week without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods and deal with normal work stress. (*Id.*) Dr. Roy further assessed that Davis's ability to interact appropriately with the general public was "inadequate." (R. 446.) In terms of functional limitations, Dr. Roy opined that Davis was moderately limited in performing daily activities and maintaining social functioning, had frequent deficiencies in concentration persistence and pace and repeated episodes of decompensation. (*Id.*)

### B.   Psychologist Dr. Elaine Hulei, Ph.D.

Between January 6, 2015 and at least June 4, 2019, Davis saw psychologist Dr. Elaine Hulei for approximately weekly psychotherapy sessions. (R. 290-92, 339-68, 431-40.)

In a response to a request from OTDA dated June 26, 2017, someone from Dr. Hulei's office (that appears to have been Dr. Hulei herself),[3] reported that Davis had been diagnosed

---

[3] The form is unsigned. (R. 287.) However, the record suggests, and the parties do not dispute, that the form was completed by Dr. Hulei. As the Commissioner points out, the individual who completed the form stated that she had first seen Plaintiff on January 6, 2015, which was the date Dr. Hulei began treating

with Post Traumatic Stress Disorder ("PTSD"), anxiety disorder and mood disorder and was taking various medications. (R. 287.) The report indicated that Davis's attitude, appearance and behavior were within normal limits; that her thoughts were somewhat disorganized; and that her mood was neutral most of the time with no psychotic features. (*Id*.) The report further indicated that Davis had experienced episodes of anxiety but did not present with suicidal or homicidal ideation. (*Id*.) The report noted that Davis's attention and concentration were impaired; she easily forgot tasks; and her insight and judgment were largely intact with "some impairment." (R. 287-88.) The report further noted that Davis's current functional assessment was "[l]ow due to anxiety and disorganization." (R. 288.) In terms of daily activities, the report stated that Davis could shop and use public transportation, but could not cook and that she maintained hobbies in addition to doing some bookkeeping work for her mother. (*Id*.) The author noted that Davis had difficulty following a schedule, but had good relationships with her peers and supervisors. (*Id*.) The author opined that Davis had some impairment in short-term memory; some deficits in organization and sustained attention; some limitations in responding to work settings; and some difficulty in interacting with people. (R. 288-89.)

On March 15, 2019, Dr. Hulei provided an overview of her treatment notes, in which she noted that Davis had never expressed any suicidal or homicidal ideations; had an IQ that likely was average to above average; had experienced trauma and had poor coping skills, but had received ongoing support; experienced age-appropriate stress and challenges in maintaining good relationships; had made progress over time, but "her sense of responsibility and work

---

Davis. (*See* Comm'r Mem. at 8 n.8 (citing R. 290).) Plaintiff notes that the form was not signed, but refers to the findings of the report as findings by Dr. Hulei. (*See* Pl.'s Mem. at 5.)

related accountability [were] rather unsteady and weak[;]" had strong reactions to stress including stomach problems; and psychiatrically, was "goal directed, reality based in thinking" and "tend[ed] to get depressed, but [was] also able to enjoy life." (R. 338.)

C.   **Southern Dutchess Family Practice**

Between at least September 21, 2016 and February 5, 2019, Davis received primary care treatment from Dr. Ed Schneider, M.D. at Southern Dutchess Family Practice. (R. 303-12, 369-78.) Among other things, Davis's treatment records indicate a history of asthma, depressive disorder, irritable bowel syndrome ("IBS") and obesity and note that she received psychiatric treatment from Dr. Roy. (R. 303, 308.) Dr. Schneider saw Davis for treatment following a fall in September 2016 (R. 303-04) and for treatment of ear pain in March 2017. (R. 305-06.) During a follow-up visit in April 2017, Dr. Schneider diagnosed Davis with hypothyroidism and started her on medication. Davis attended two more follow-up visits in May and June 2017. (R. 308-12.)

On July 7, 2017, Dr. Schneider completed an assessment regarding Davis. (R. 293-97.) Dr. Schneider wrote that Davis was "improving," but could not tolerate out of home employment because of anxiety, trouble maintaining affect and progressive anxiety/depression with stress at jobs. (R. 295-96.)  In terms of Davis's physical abilities, Dr. Schneider noted that she could occasionally lift and carry up to 20 pounds; stand and/or walk up to two hours per day; sit up to eight hours per day; and could push and/or pull no more than two hours per day. (R. 296.)

On December 14, 2017, Davis saw Dr. Schneider for low back pain and he referred her to physical therapy. (R. 377-78.) Dr. Schneider saw Davis again in February 2018 to complete forms for a change in her insurance. (R. 369-70.) On December 28, 2018, Davis saw Dr. Schneider for a general medical evaluation. (R. 374-76.) Dr. Schneider noted that Davis reported fewer stomach

issues that she used to; had stopped taking thyroid pills in late October; and had been doing poorly psychologically when she went off her medications, but was back on her medications and was seeing Dr. Hulei weekly and Dr. Roy every few months. (R. 374.) Dr. Schneider noted that Davis's asthma was "generally doing ok" and that her back pain had resolved, but she was experiencing some pain in her right hip that caused discomfort when sitting too long. (R. 375.) During another visit on February 5, 2019, Dr. Schneider noted that Davis's IBS had worsened due to stress and assessed that it was difficult for her to meet standards of employment due to depression, but she was "[d]oing better generally" on her medications. (R. 371-73.)

###    D.    Digestive Disease Center

Davis began treatment for gastroesophageal reflux disease ("GERD") and irritable bowel syndrome ("IBS") at the digestive Disease Center of the Hudson Valley on March 4, 2019. (R. 400-03.) An April 2019 colonoscopy and endoscopy were normal (R. 414-15, 421-22), but a follow-up biopsy suggested moderately active Crohn's disease. (R. 416-17.) Davis underwent another endoscopy on May 20, 2019, which also was normal. (R. 412-13.) In June 2019, Davis received a vitamin B12 injection and a nutritional assessment for Crohn's disease. (R. 388-91.)

###    E.    State Agency Consultant Dr. H. Ferrin, Ph.D.

On July 28, 2017, state agency consultant Dr. H. Ferrin, Ph.D., completed a mental residual function capacity assessment in conjunction with her SSI application. (R. 77-80.) Dr. Ferrin assessed that Davis was not limited in her ability to carry out instructions and was not significantly limited in her ability to maintain attention and sustain an ordinary routine. (R. 78.) Dr. Ferrin assessed that Davis was moderately limited in her ability to perform activities within a schedule; maintain regular attendance and be punctual with customary tolerance; work in coordination

with or in proximity to others without being distracted; complete a normal workday or workweek without interruption; and perform at a consistent pace. (*Id*.) In terms of social interactions, Dr. Ferrin assessed that Davis was not significantly limited in interacting with supervisors or coworkers, but was moderately limited in interacting appropriately with the general public. (*Id*.) Regarding adaptation, Dr. Ferrin assessed that Davis was moderately limited in her ability to respond appropriately to changes in the work setting. (R. 79.)

F.    **March 7, 2019 Psychiatric Consultative Examination – Dr. Alex Gindes, Ph.D.**

On March 7, 2019, Davis saw Dr. Alex Gindes for a psychiatric consultative examination. (R. 327-31.) Upon examination, Dr. Gindes noted that Davis related in a "highly tense manner" and seemed tense, depressed and anxious. (R. 328.) Dr. Gindes found that Davis's attention and concentration were impaired by anxiety in the evaluation and emotional stress associated with depression. (R. 329.) Davis had "great difficulties" with simple calculations and her recent and remote memory skills were mildly impaired. (*Id*.) Dr. Gindes estimated Davis's intellectual functioning to be in the normal range and noted that her insight and judgment seemed fair. (*Id*.) Dr. Gindes found that Davis was able to dress, bathe and groom herself, but "very irregularly" and while she occasionally cleaned and drove a car, she did not cook, do laundry, shop or manage money. (*Id*.)

Dr. Gindes opined that Davis could understand, remember and apply simple directions and instructions with no limitations, but was moderately limited in her ability to understand, remember and apply complex directions and instructions and use reason and judgment to make work-related decisions. (R. 329.) He further opined that Davis had marked limitations in her ability to interact adequately with supervisors, coworkers and the public; sustain concentration

9

and perform at a consistent pace; and maintain personal hygiene and appropriate attire. (R. 330.) Dr. Gindes further opined that Davis's ability to sustain an ordinary routine and regular attendance at work, regulate emotions, control behavior and maintain well-being were extremely limited. (*Id*.) He found that she had no limitations in maintaining awareness of normal hazards and taking appropriate precautions. (*Id*.) Dr. Gindes opined that Davis's difficulties were caused by severe depression, anxiety and associated cognitive deficits and could be expected to continue for more than one year. (*Id*.)

IV.     **The June 26, 2019 Administrative Hearing**

Plaintiff appeared with counsel for an administrative hearing before ALJ McCormack on June 26, 2019. (R. 32-58.)

A.     **Plaintiff's Testimony**

Plaintiff testified regarding her digestive problems, related to IBS and Crohn's disease, and that she experienced general anxiety and had trouble concentrating. (R. 41-43.) When asked about her social interactions, Davis testified that she saw friends less frequently after a "big blowup" between a couple of friends. (R. 44.) She testified that she visited her aunt in Tennessee, but needed time to recover after the flight, and was doing bookkeeping for her mother once a month, at most. (R. 45.) Davis further testified that she always carried a bag in case she needed to throw up and that her nausea and anxiety increased when she was stressed. (R. 47-48.) Davis testified that she was able to perform some daily activities, such as the basics of taking care of her cat, but that her parents did most things around the house. (R. 49-50.)

**B.**      **Vocational Expert Testimony**

Vocational Expert ("VE") Carrie Whitlow also testified at the hearing. (R. 50-57.) The ALJ

asked the VE to assume a hypothetical person who could perform sedentary work, push and pull

for two hours in an eight-hour workday, was limited to low stress work defined as jobs containing

no more than simple, routine repetitive tasks involving only simple work-related decisions with

few, if any, workplace changes and where there was only occasional interaction with supervisors

and co-workers and no interaction with the general public. (R. 51.) The ALJ then asked the VE if

there were any jobs in the national economy that an individual with the same profiles could

perform. (*Id*.) The VE testified that there were jobs such a person could perform, including final

assembler (713.687-018), table worker (739.687-182) and masker (715.687-086). (*Id*.) However,

the VE testified that if such person also was limited such that they could not maintain a regular

schedule, those jobs would no longer be viable. (R. 53.) Further, the VE testified that, if the

individual as not able to respond "appropriately" to supervisors, such as by failing to acknowledge

feedback, or responding with tears or outbursts, that limitation would preclude competitive

employment. (R. 54-56.)

**V.      ALJ McCormack's Decision And Appeals Council Review**

Applying the Commissioner's five-step sequential evaluation, *see infra* Legal Standards

Section II, the ALJ found at step one that Davis had not engaged in substantial gainful activity

since June 21, 2017, the date she filed her application. (R. 12.) At step two, the ALJ determined

that Davis had the following severe impairments: IBS, Crohn's disease with GERD, obesity, major

depression with anxiety disorder and PTSD. (R. 13.) The ALJ found that Davis's hypothyroidism

was not severe and that, although a July 2017 report noted a history of a non-verbal learning disorder, that condition was not a medically determinable or severe impairment. (*Id*.)

At step three, the ALJ found that Davis did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 13.) The ALJ specifically considered Listing 5.00 (digestive system), but found that there was no evidence of recurrent stenotic regions, involuntary weight loss, perineal disease, severe pain (requiring narcotic treatment), anemia or other serious complications from Davis' IBS, Crohn's disease or GERD. (*Id*.) The ALJ also considered Listings 12.04 (depressive, bipolar and related disorders) and 12.06 (anxiety disorders). (*Id; see also* 20 C.F.R. Pt. 404 Subpt. P, App'x 1, §§ 12.04(A), 12.06(A)). The ALJ discussed the "paragraph B' criteria" and found that Davis had moderate limitations in understanding, remembering or applying information; interacting with others; concentrating, persisting or maintaining pace; and adapting or managing oneself. (R. 13-14.) Accordingly, the ALJ found that the paragraph B criteria were not satisfied. (R. 14-15.) The ALJ also considered whether the "paragraph C" criteria were satisfied, but found that the evidence failed to establish the presence of those criteria. (R. 15.)

The ALJ then assessed Davis's RFC and determined that she was able to perform sedentary work as defined in 20 CFR § 416.967(a), except that she could only push and pull for two hours during the course of an eight-hour work day and was limited to low stress jobs, "defined as jobs containing no more than simple, routine, and repetitive tasks, involving only simple work related decisions; with few, if any, workplace changes; and where there is only occasional interaction with supervisors, coworkers or the general public." (R. 15.) The ALJ noted that, while the record

suggested a fairly long history of symptoms of depressions and anxiety, the evidence was not strongly supportive of Davis's allegations regarding the limiting effects of her impairments. (R. 16.) The ALJ discussed the medical evidence in the record and explained his conclusion that Davis could perform low stress work as set forth in the RFC. (R. 16-19.) The ALJ also noted that he found portions of Dr. Roy's opinion persuasive; Dr. Hulei's March 2019 summary "somewhat persuasive[;]" Dr. Ferrin's assessment "fairly persuasive" and the remaining opinion evidence, including Dr. Gindes's opinion, unpersuasive.  (R. 18-21.)

At step four, the ALJ found that Davis had no past relevant work. (R. 22.) At step five, the ALJ considered Davis's age, education, work experience and RFC and, based on testimony from the VE, concluded that there were jobs existing in significant numbers in the national economy that Davis could perform, including final assembler and table worker. (R. 23.) Therefore, the ALJ found that Plaintiff was not disabled during the relevant period and denied her claim for benefits. (*Id*.) Following the ALJ's decision, Davis sought review from the Appeals Council, which denied her request on May 20, 2020. (R. 1-3.)

## LEGAL STANDARDS

### I.     Standard Of Review

A motion for judgment on the pleadings should be granted if it is clear from the pleadings that "the moving party is entitled to judgment as a matter of law." *Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am., Local 537*, 47 F.3d 14, 16 (2d Cir. 1995) (citing Fed. R. Civ. P. 12(c)). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

"The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence." *Ulloa v. Colvin*, No. 13-CV-04518 (ER), 2015 WL 110079, at *6 (S.D.N.Y. Jan. 7, 2015) (citing *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision[.]" *Id.*; *accord Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987). A court must set aside legally erroneous agency action unless "application of the correct legal principles to the record could lead only to the same conclusion," rendering the errors harmless. *Garcia v. Berryhill*, No. 17-CV-10064 (BCM), 2018 WL 5961423, at *11 (S.D.N.Y. Nov. 14, 2018) (quoting *Zabala v. Astrue*, 595 F. 3d 402, 409 (2d Cir. 2010)).

Absent legal error, the ALJ's disability determination may be set aside only if it is not supported by substantial evidence. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (vacating and remanding ALJ's decision). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). However, "[t]he substantial evidence standard is a very deferential standard of review—even more so than the clearly erroneous standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder *would have to conclude otherwise*." *Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), *as amended* (Apr. 30, 2019) (summary order) (emphasis in original) (citation and internal quotation marks omitted). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. *Diaz v. Shalala*, 59 F.3d 307, 312 (2d Cir. 1995).

## II.     __Determination Of Disability__

A person is considered disabled for benefits purposes when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 1382c(a)(3)(A).

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

In determining whether an individual is disabled, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . [continuous period of 12 months], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix

1 [(the "Listings")] . . . and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 416.920(a)(4) (internal citations omitted).

If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. § 416.920(a)(4).

"When determining whether a claimant is disabled due to a mental impairment, an ALJ must apply a 'special technique' at the second and third steps of the five-step framework." *Cherry v. Comm'r of Soc. Sec.*, No. 17-CV-07999 (VEC), 2019 WL 1305961, at *11 (S.D.N.Y. Mar. 22, 2019) (quoting *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)). First, the ALJ must determine if the claimant has a "medically determinable mental impairment." *Id.* If the claimant is found to have such an impairment, the ALJ must "rate the degree of functional limitation," across four broad functional areas: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist or maintain pace; and (4) adapt or manage oneself. 20 C.F.R. § 416.920(a); *see also* 20 C.F.R. Pt. 404, Subpt. P App'x 1 § 12.00E.

After the first three steps (assuming that the claimant's impairments do not meet or medically equal any of the Listings), the Commissioner is required to assess the claimant's RFC "based on all the relevant medical and other evidence in [the claimant's] case record." 20 C.F.R.

§ 416.920(e). A claimant's RFC is "the most [the claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1).

The claimant bears the burden of proof as to the first four steps. *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999). It is only after the claimant proves that she cannot return to work that the burden shifts to the Commissioner to show, at step five, that other work exists in the national and local economies that the claimant can perform, given the claimant's RFC, age, education and past relevant work experience. *Id.* at 51-52.

### III.   Regulations Regarding Consideration Of Medical Opinions And Prior Findings For Applications Filed On Or After March 27, 2017

Under the regulations applicable to Plaintiff's claim, the ALJ considers five factors in evaluating the persuasiveness of medical opinions: (1) supportability; (2) consistency; (3) relationship of the source with the claimant, including length of the treatment relationship, frequency of examination, purpose of the treatment relationship, extent of the treatment relationship and whether the relationship is an examining relationship; (4) the medical source's specialization; and (5) other factors, including but not limited to "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA] disability program's policies and evidentiary requirements." 20 CFR § 416.920c(c). Using these factors, the most important of which are supportability and consistency, the ALJ must articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the claimant's] case record." *Id.* § 416.920c(b).

With respect to the supportability factor, the regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the

17

more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 CFR

§ 416.920c(c)(1). As to the consistency factor, the regulations provide that "[t]he more consistent

a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other

medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s)

or prior administrative medical finding(s) will be." *Id.* § 416.920c(c)(2). While the ALJ "may, but

[is] not required to, explain how [he] considered" the factors of relationship with the claimant,

the medical source's specialization, and other factors, the ALJ "*will* explain how [he] considered

the supportability and consistency factors for a medical source's medical opinions or prior

administrative medical findings." *Id.* § 416.920c(b)(2) (emphasis added). An ALJ must provide

sufficient explanation to allow a reviewing court to "trace the path of [the] adjudicator's

reasoning[.]" *Amber H. v. Saul*, No. 20-CV-00490 (ATB), 2021 WL 2076219, at *6 (N.D.N.Y. May

24, 2021) (quoting *Revisions to Rules Regarding the Evaluation of Medical Evidence* ("*Revisions

to Rules*"), 2017 WL 168819, 82 Fed. Reg. 5844-01, at 5858 (Jan. 18, 2017) ("We expect that the

articulation requirements in these final rules will allow a . . . reviewing court to trace the path of

an adjudicator's reasoning[.]")).

## DISCUSSION

Plaintiff argues that "the ALJ's assessment of the mental medical evidence is unsupported

by substantial evidence as the ALJ failed to adequately evaluate the medical opinions in

accordance with the prevailing rules and regulations." (Pl.'s Mem., ECF No. 21, at 15.) First,

Plaintiff argues that the ALJ improperly evaluated the opinion of Dr. Roy by making his own

inferences from the treatment notes and by failing to properly evaluate the consistency of Dr.

Roy's opinion. (Pl.'s Mem. at 16-21.) Second, Plaintiff argues that the ALJ improperly evaluated

the opinion of Dr. Gindes by implying that Plaintiff was malingering, even though Dr. Gindes explicitly stated otherwise, and that Dr. Gindes's opinion was, in fact, consistent with and supported by the record.  (*See id.* at 16, 21-24.) The Court addresses the ALJ's treatment of each of these opinions in turn.

## I.    The ALJ's Evaluation Of Dr. Roy's Opinions

Plaintiff asserts that the ALJ improperly substituted his own judgment for that of Dr. Roy when he found that Davis could perform full-time employment, despite Dr. Roy's opinion that Davis did not experience "well" periods lengthy enough to do so. (Pl.'s Mem. at 17.) Plaintiff further suggests that the ALJ's conclusion was improper because the ALJ credited other portions of Dr. Roy's opinion and argues that Dr. Roy's conclusions support a finding of disability. (Pls.'s Mem. at 17-18.)

Although an ALJ is not permitted to substitute his own opinion for that of a medical professional, this does not mean that he must accept or reject the entirety of any doctor's opinion. *See Camille v. Colvin*, 652 F. App'x 25, 29 (2d Cir. 2016) ("An ALJ may accept parts of a doctor's opinion and reject others."); *see also Matta v. Astrue*, 508 F. App'x 53 (2d Cir. 2013) ("Although the ALJ's conclusions may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole."). "What is required is that the ALJ explain the bases for his findings with sufficient specificity to permit meaningful review." *Withus v. Saul*, No. 18-CV-10923 (VSB) (JLC), 2021 WL 2012270, at *11 (S.D.N.Y. May 19, 2021). Here, the Court finds that the ALJ adequately addressed the consistency and supportability factors and that his

assessment was not based on his own interpretation of Dr. Roy's treatment notes, but rather his assessment of the record as a whole.  (*See* R. 15-22.)

The ALJ found Dr. Roy's opinion that Davis had no adaptive limitations, but might experience difficulties with workplace interactions, understanding/memory, sustaining concentration/pace and performing daily tasks when she experienced increased stress, to be persuasive because it was "fairly consistent" with the record and was supported by Dr. Roy's April 2017 examination, described in the report, which revealed good cognitive capabilities, despite some active anxiety and depression. (R. 20.) In contrast, the ALJ found that the section of Dr. Roy's report concluding that Davis did not experience "well" periods lengthy enough to allow her to sustain fulltime employment was not consistent with the record as a whole and that Davis's therapy records, in particular, suggested that Davis could sustain social relationships, part-time work and other simple tasks/projects, provided these activities were not overly stressful, and that that there was no indication of extreme symptoms or long periods of depression/anxiety which would have prevented Davis from engaging in sustained activity or social interaction. (R. 20.) Moreover, earlier in his decision, the ALJ explained that Dr. Roy's treatment notes provided less detail than Dr. Hulei's treatment notes and included "brief exam reports that are handwritten, focus on the claimant's subjective complaints, and provide few details of his clinical observations." (R. 18.) Accordingly, the ALJ adequately explained his reasons for finding Dr. Roy's opinion that Davis could not sustain full-time work unpersuasive. Moreover, the ALJ did not find Plaintiff capable of performing full-time work without limitations, but limited her to low stress work with various restrictions, which took into account Dr. Roy's opinion that Davis had greater difficulties with increased stress. (R. 20.)

The ALJ found that Dr. Roy's January 2019 report, in which he indicated that Davis had serious and extreme limitations with respect to a wide variety of mental tasks and that she experienced repeated episodes of decompensation, was unpersuasive for the same reasons. (R. 20.) The ALJ explained that there was no evidence that Davis experienced decompensation, as Dr. Roy opined, and that the evidence already discussed "likewise strongly indicates that [Davis] would be capable of tolerating a routine/schedule which did not involve overly stressful activity." (*Id*.) The ALJ also found Dr. Roy's opinion inconsistent with the fact that Davis had "remained capable of at least some sort of work during the relevant period[,]" including working for her mother, and was inconsistent with his earlier report. (*Id*.) As for supportability, the ALJ reiterated that Dr. Roy's treatment notes provided "few details of his clinical observations" and, thus, there were no clinical findings to corroborate this opinion and contradict his earlier one. (*Id*.)

Plaintiff further argues that the ALJ improperly discounted Dr. Roy's opinion because it was based on subjective complaints. (*Id*. at 19-20.) However, in determining the persuasiveness of Dr. Roy's opinions, the ALJ properly considered whether there was objective medical evidence to support those opinions, including in Dr. Roy's treatment notes. (*See* R. 18 (discussing Dr. Roy's treatment notes and concluding that, although they did suggest that Davis experienced some ongoing depression and anxiety, and that she tended to experience increased stress in response to certain specific life stressors, there was no indication of serious cognitive, concentration or attention deficits). In sum, the Court finds that the ALJ adequately discharged his regulatory obligations in evaluating Dr. Roy's opinions.

## II.    The ALJ's Evaluation Of Dr. Gindes's Opinion

The ALJ explained that he found the report of the consultative examiner, Dr. Gindes, unpersuasive because, although it was supported by Davis's "subjective reports and her clinical presentation during Dr. Gindes's sole exam[,]" it was "strongly inconsistent with the other medical evidence of record[,]" including Davis's reports to Dr. Roy and Dr. Hulei and Dr. Hulei's therapy notes. (R. 19; *see also* R. 16-17 (discussing inconsistencies between Davis's allegations and Dr. Hulei's therapy notes); 18 (same for Dr. Roy).) Plaintiff argues that this analysis, "assumes that Plaintiff was fabricating her symptoms to [Dr. Gindes]" and that the ALJ appeared to assume that Dr. Gindes was incompetent and that Plaintiff was malingering. (Pl.'s Mem. at 21-23.) However, the ALJ properly considered the consistency of Dr. Gindes's report with other evidence in the record, including Dr. Hulei's treatment notes. (R. 19.) As part of this analysis, the ALJ noted that Plaintiff's reports to Dr. Hulei and Dr. Roy were not as extreme as her reports to Dr. Gindes. (*See id.*) This explanation was necessary to explain why the ALJ found the opinion unpersuasive even though it was supported by Dr. Gindes's examination and Davis's reports and presentation on that particular day. Thus, rather than simply accusing Davis of malingering, the ALJ necessarily explained his reasoning as to the supportability and consistency factors.

Finally, Plaintiff argues that there is substantial evidence of her mental impairments and Dr. Gindes's opinion should be found fair and complete. (Pl.'s Mem. at 23-24.) However, while Plaintiff may disagree with the ALJ's findings, Plaintiff has failed to show that no reasonable factfinder could have reached the ALJ's conclusions based on the evidence in the record. *See Bonet ex rel. T.B. v. Colvin*, 523 F. App'x 58, 59 (2d Cir. 2013) ("The question is not whether there is substantial evidence to support the plaintiff's position, but whether there is substantial

evidence to support the ALJ's decision."). In sum, the Court finds that there is no error in the ALJ's application of the regulatory factors and that the ALJ's evaluation of the medical evidence is supported by substantial evidence.[4]

## CONCLUSION

For the reasons set forth above, Plaintiff's motion is denied and the Commissioner's cross-motion is granted. The Clerk of Court is respectfully requested to close this case.

**SO ORDERED.**

DATED:      New York, New York
            December 8, 2021

_____
STEWART D. AARON
United States Magistrate Judge

---

[4] Accordingly, I do not address Plaintiff's argument regarding harm, namely that if the opinions had been "properly evaluated," Plaintiff would have been found to meet Listings 12.04 and 12.06. (*See* Pl.'s Mem. at 24-25.)